**IN THE UNITED STATES DISTRICT COURT**
**FOR NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ICLOUD ACCOUNTS shannytown80@icloud.com AND keyssatori80@gmail.com THAT IS STORED AT PREMISES CONTROLLED BY APPLE, INC.** | **Case No. 3:25mj299-HTC** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jarrett L. Swearingen, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and information, including the contents of communications, associated with Apple ID: **shannytown80@icloud.com** ("TARGET ACCOUNT 1"), and Apple ID: **keyssatori@gmail.com** ("TARGET ACCOUNT 2") that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA. The information to be disclosed by Apple and

searched by the government is described in the following paragraphs and in Attachments A and B.

2.    Your Affiant is a Special Agent with the Drug Enforcement Administration (DEA) and has been so employed since October 2016. Your Affiant is currently assigned to the Pensacola Resident Office, charged with investigating drug trafficking and money laundering violations under Titles 18 and 21 of the United States Code. Your Affiant has received 20 weeks of specialized training in Quantico, Virginia, pertaining to drug trafficking, money laundering, undercover operations and electronic and physical surveillance procedures. Before becoming a Special Agent with the DEA, your Affiant was employed by the Escambia County, Florida, Sheriff's Office for approximately seven years. Of those seven years, your Affiant spent approximately four years in a narcotics unit where your Affiant was charged with investigating drug-trafficking violations under the Florida State Statutes. Your Affiant has been involved in numerous investigations dealing with the possession, manufacture, distribution, and importation of controlled substances.

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Satori KEYS has (and continues to) unlawfully conspired to distribute a controlled substance, in violation of Title 21, United States Code, Section 846; possessed with intent to distribute a controlled substance in violation of Title 21, United States Code, Section 841(a)(1); and possessed firearms as convicted felons, in violation of Title 18, United States Code, Section 922(g). There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## JURISDICTION

5.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.    In January 2025, members of the Escambia County Sheriff's Office (ECSO) initiated an investigation into the drug trafficking activities of Calvin THOMAS JR.

7.    In January 2025, investigators received information from a confidential source ("CS") that a black male he/she knows as "Boomie" was involved in the sale and distribution of large quantities of cocaine. Investigators were able to corroborate the information provided by the CS through a query of the Escambia County Sheriff's Office Master Name Index (MNI) for the nickname "Boomie" which revealed a male named CALVIN DUDLEY THOMAS JR.

8.    The CS provided that he/she was in recent and continuous contact with THOMAS JR. through cell phone calls and text messages. The CS provided that THOMAS JR utilized the cellular phone number (850) 490-2955, to distribute narcotics.

9.    In January 2025, members of the Escambia County Sheriff's Office contacted the aforementioned CS with the intent of conducting a controlled purchase of cocaine from THOMAS JR. in Escambia County, Florida. Investigators with the Sheriff's Office met with the CS at a predetermined meet location and searched the CS, where no other money or drugs were found. Investigators with the Sheriff's Office searched the CS's vehicle where no other money or drugs were found. The CS contacted THOMAS JR, who was utilizing cell phone number (850) 490-2955, and THOMAS JR arranged for the CS to meet him at a predetermined buy location to conduct the transaction. The CS was equipped with an audio listening device for safety and verification purposes. The

4

CS was provided with a sum of recorded Escambia County Sheriff's Office investigative funds. The CS then proceeded to a predetermined buy location to meet with THOMAS JR. Investigators with the Sheriff's Office monitored an audio/visual listening device during this incident and maintained constant visual surveillance of the CS. Escambia County Sheriff's Office narcotics investigators who were conducting surveillance observed THOMAS JR arrive in a rental vehicle and engage in a conversation consistent with that of a narcotics transaction with the CS. The CS then provided THOMAS JR. a sum of recorded investigative funds for a quantity of cocaine. Upon obtaining the cocaine, the CS proceeded directly back to the predetermined meet location while under constant surveillance. The investigators took custody of the cocaine obtained during this incident. The investigators searched the CS and his/her vehicle where no other money or drugs were found. The cocaine field-tested positive for the presence of cocaine. Investigators showed a picture, with no identifying information of THOMAS JR to the CS, at which time he/she positively identified him as the person who sold them cocaine.

10.    In February 2025, members of the Escambia County Sheriff's Office contacted the aforementioned CS with the intent of conducting a controlled purchase of cocaine from THOMAS JR. in Escambia County, Florida. Investigators with the Sheriff's Office met with the CS at a predetermined meet

location and searched the CS and his/her vehicle, where no other money or drugs were found. The CS contacted THOMAS JR, who was utilizing cell phone number (850) 490-2955, and THOMAS JR arranged for the CS to meet him at a predetermined buy location to conduct the transaction. The CS was equipped with an audio listening device for safety and verification purposes. The CS was provided with a sum of recorded Escambia County Sheriff's Office investigative funds. The CS then proceeded to a predetermined buy location to meet with THOMAS JR. Investigators with the Sheriff's Office monitored an audio/visual listening device during this incident and maintained constant visual surveillance of the CS. Escambia County Sheriff's Office narcotics investigators observed THOMAS JR arrive in a different rental vehicle and engage in a conversation consistent with that of a narcotics transaction with the CS. The CS then provided THOMAS JR. a sum of recorded investigative funds for a quantity of cocaine. Upon obtaining the cocaine, the CS proceeded directly back to the predetermined meet location while under constant visual surveillance. The investigators took custody of the cocaine obtained during this incident. The investigators searched the CS and his/her vehicle where no other money or drugs were found. The cocaine field-tested positive for the presence of cocaine. Investigators showed a picture, with no identifying information of THOMAS JR to the CS, at which time he/she positively identified him as the person who sold them cocaine.

6

11.    Based on the above controlled purchases of cocaine from THOMAS JR., a state warrant application affidavit for the use of a Pen Register/Trap and Trace and cell site location for the cell phone number (850) 490-2955 was submitted by an ECSO Narcotics Investigator. On February 19, 2025, the Honorable Judge Jennifer Frydrychowicz signed the PRTT.

12.    Investigators were able to electronically surveil THOMAS JR's cellular phone, which consistently pinged in the area of 2403 North F Street Pensacola, Florida 32501 from the hours of 0900 to 2100 on average.

13.    Investigators from the Sheriff's Office identified a primary residence being used by THOMAS JR at 10428 Tanton Road, Pensacola, Florida through data collected which pinged THOMAS JR's cellular device in the late night and early morning hours at 10428 Tanton Road. Investigators conducted stationary surveillance along with electronic surveillance and observed THOMAS JR walking through the garage-port door of 10428 Tanton Road freely on multiple occasions. Investigators also observed a male identified as Satori KEYS (KEYS) walking through the garage-port door of 10428 Tanton Road freely on multiple occasions. This behavior is consistent with someone who has domain and predominantly resides at that residence.

14.    In March 2025, during the early morning hours, investigators with the ECSO Narcotics Unit conducted surveillance at 10428 Tanton Road. During the

7

surveillance, investigators removed the trash that was placed along the roadside and abandoned by the residents of 10428 Tanton Road. Investigators searched the contents of the trash and located two clear plastic baggies with the corners removed which contained white powdery residue. Investigators also located a clear plastic corner baggie with white powdery residue. Both baggies were field-tested by investigators which yielded positive results for the presence of cocaine. Investigators also located two individual clear plastic baggies with the corners removed which contained pink powdery residue. Investigators also located two clear corner plastic baggies with pink powdery residue. Investigators also located a whole clear plastic baggie with pink powdery residue. All five baggies were field-tested by investigators which all yielded positive results for the presence of fentanyl. Investigators also located four clear plastic baggies with the corners removed with a leafy-green residue inside. Investigators also located a clear plastic corner baggie with leafy-green residue inside. Investigators also located a small quantity of a loose leafy-green substance. Investigators knew based on their training and experience the residue and loose substance was indeed marijuana. Investigators also located two empty bottles of Promethazine Hydrochloride with the prescription labels removed. In addition to the evidence collected, investigators also located a paper bag from a local restaurant with the name "Satori K" listed on the labeled receipt which was taped to the bag.

15.    In April 2025, during the early morning hours, investigators with the ECSO Narcotics Unit conducted surveillance at 10428 Tanton Road. During the surveillance, investigators removed the trash that was placed along the roadside and abandoned by the residents of 10428 Tanton Road. Investigators searched the contents of the trash and located four clear plastic baggies with the corners removed which contained leafy-green residue. Investigators also located two clear plastic corner baggies with leafy-green residue. All of the baggies collected were field-tested by investigators which yielded positive results for the presence of marijuana.

16.    Through the investigation, investigators learned that THOMAS JR and other members of his drug trafficking organization utilized social media accounts, including Facebook. Investigators monitored THOMAS JR's Facebook account, utilizing undercover electronic surveillance techniques, and observed THOMAS JR post videos of distribution quantities of controlled substances and United States currency.

17.    On April 25, 2025, An ECSO Investigator obtained a state search warrant for THOMAS JR's Facebook account ("Boom House"). On April 25, 2025, the warrant was served to Meta Platforms LLC., and on May 8, 2025, Meta Platforms LLC., responded and provided the requested data. An ECSO

investigator reviewed the data for THOMAS JR's Facebook account and observed

numerous evidentiary photographs, videos, and messages indicative of THOMAS

JR being involved in the sale and distribution of controlled substances. Below are

a sample of photographs and text message communications located within the

data. Some of these photographs are still frames of videos that were posted:





2024-10-13 02:37:47 UTC

**Body** No

**Author** Ke Fountain (Facebook: 100067468885066)

**Sent** 2024-12-07 16:33:03 UTC

**Body** what you smoking like ?

**Author** Boom House (Facebook: 100013649714263)

**Sent** 2024-12-07 16:53:07 UTC

**Body** Pressure

**Author** Ke Fountain (Facebook: 100067468885066)

**Sent** 2024-12-07 16:53:37 UTC

**Body** what you want for a quarter i'm at home on miller st pull up i got my jitts

**Author** Boom House (Facebook: 100013649714263)

**Sent** 2024-12-07 17:38:52 UTC

**Body** 50



**Author** Catee Likely (Facebook: 100007810385781)

**Sent** 2024-10-26 23:11:29 UTC

**Body** yo

**Author** Boom House (Facebook: 100013649714263)

**Sent** 2024-10-26 23:33:30 UTC

**Body** Yo

**Author** Catee Likely (Facebook: 100007810385781)

**Sent** 2024-10-26 23:33:39 UTC

**Body** i need some smoke.

**Author** Boom House (Facebook: 100013649714263)

**Sent** 2024-10-26 23:34:40 UTC

**Body** Wya

**Author** Catee Likely (Facebook: 100007810385781)

**Sent** 2024-10-26 23:36:53 UTC

**Body** michigan

**Author** Boom House (Facebook: 100013649714263)

**Sent** 2024-10-26 23:45:41 UTC

**Body** If u can wait I'm at da mall I'll be back to my spot bout a hour

2024-11-07 18:02:26 UTC
**Body** Boomie I'm finna pull up get some smoke u got cash app …. I be going to the dispensary that's y I don't pull up all the time

**Author** Boom House (Facebook: 100013649714263)
**Sent** 2024-11-07 19:05:17 UTC
**Body** Ion have no app

**Author** Jamaica Allen (Facebook: 100011373289563)
**Sent** 2024-11-07 19:09:17 UTC
**Body** Okkk

**Author** Jamaica Allen (Facebook: 100011373289563)
**Sent** 2024-11-07 19:49:44 UTC
**Body** Finna pull up

**Author** Jamaica Allen (Facebook: 100011373289563)
**Sent** 2024-11-07 20:06:02 UTC
**Body** Pulling in now have it ready lol

**Author** Jamaica Allen (Facebook: 100011373289563)
**Sent** 2024-11-07 20:08:00 UTC
**Body** Now yo ass could've said you was pulling off got my damn hair wet l

**Author** Jamaica Allen (Facebook: 100011373289563)
**Sent** 2024-11-07 20:09:10 UTC
**Body** You missed a call from Jamaica.

**Author** Boom House (Facebook: 100013649714263)
**Sent**

Meta Platforms Business Record Page 4849

2024-11-07 20:09:24 UTC
**Body** Tell manny give it to you had shoot to hospital

18.     Based on your Affiant's training and experience and the above photos and text messages from THOMAS JR's Facebook profile, I believe that THOMAS JR was involved in the sale and distribution of controlled substances, and the large quantities of United States currency are the proceeds from the sale of those controlled substances. During a review of the Meta data return, it was determined that THOMAS JR's registered email with Facebook was keyssatori80@gmail.com.

19.     In April 2025, during the early morning hours, investigators with the ECSO Narcotics Unit conducted surveillance at 10428 Tanton Road. During the

surveillance, investigators removed the trash that was placed along the roadside and abandoned by the residents of 10428 Tanton Road. Investigators searched the contents of the trash and located a clear plastic corner baggie with white powdery residue. The baggie was field-tested by investigators which yielded positive results for the presence of fentanyl. Investigators also located a clear plastic corner less baggie with white powdery residue. The baggie was field-tested by investigators which yielded positive results for the presence of cocaine. Investigators also located three clear plastic corner baggies with no residue, along with a clear plastic corner baggie and a clear plastic corner less baggie both with leafy-green residue. Both baggies were field-tested by investigators which yielded positive results for the presence of marijuana.

20.    In May 2025, during the early morning hours, investigators with the ECSO Narcotics Unit conducted surveillance at 10428 Tanton Road. During the surveillance, investigators removed the trash that was placed along the roadside and abandoned by the residents of 10428 Tanton Road. Investigators searched the contents of the trash and located ten clear plastic baggies with the corners removed which contained leafy-green residue. Investigators also located a clear plastic corner baggie with leafy-green residue. All of the baggies collected were field-tested by Investigators which yielded positive results for the presence of marijuana.

13

21.     As THOMAS JR.'s cellular phone was pinging in the area of 2403 North F Street, Pensacola, Florida during the daytime and evening hours, investigators with the ECSO Narcotics Unit also conducted stationary physical surveillance at that location. Investigators observed THOMAS JR and KEYS standing in the backyard area of the premises. While conducting surveillance, investigators learned that THOMAS JR and KEYS and other known and unknown persons primarily utilize the rear door to the residence instead of the front door to further avoid detection from law enforcement of their criminal activity.

22.     On May 13, 2025, investigators obtained a Drone Authorization Search Warrant for 2403 North F Street Pensacola, Florida. On May 15, 2025, investigators with the ECSO conducted surveillance via their agency-issued drone at 2403 North F Street Pensacola, Florida. Investigators were able to observe via drone that 2403 North F Street is a divided "duplex" style structure with Units A and B. Investigators observed via drone surveillance THOMAS JR and KEYS walking through the rear door to Unit A of 2403 North F Street. Investigators also observed via drone surveillance KEYS conducting hand-to-hand transactions with unidentified males in the backyard before entering both Units A and B freely with what appeared to be United States currency in hand. Investigators also observed via drone surveillance both THOMAS JR and KEYS locking and unlocking the rear door to Unit A with a key indicating dominion and control over the residence.

Investigators also observed multiple vehicles arriving and quickly departing from the rear backyard area of the residence throughout the entirety of the surveillance.

23.    On May 16, 2025, investigators conducted surveillance via drone at 2403 North F Street Pensacola, Florida. Investigators observed via drone surveillance THOMAS JR unlocking the rear door to Unit A and entering the residence. Shortly after, investigators observed THOMAS JR exit the rear door to Unit A and conduct a hand-to-hand transaction with an unidentified male before locking the rear door to Unit A indicating dominion and control over the residence. Your Affiant knows based on his training and experience that hand-to-hand transactions occurring at a residence with individuals frequently arriving and departing are indicative of the street-level sales of narcotics.

24.    On May 17, 2025, investigators with the ECSO Narcotics Unit obtained a state search warrant for the residences of 10428 Tanton Road Pensacola, Florida, 2403 North F Street Unit A, and 2403 North F Street Unit B to search for evidence in relation to possession of controlled substances with intent to sell, manufacture, or deliver involving THOMAS JR and KEYS.

25.    On May 23, 2025, law enforcement executed the state search warrant at 2403 North F Street Unit A. Prior to arrival, an investigator with the Narcotics Unit who is also a licensed Federal Aviation Administration (FAA) UAS (Unmanned Aircraft Systems) pilot conducted surveillance via an agency-issued

drone and observed THOMAS JR exit the rear door to Unit A and leave the premises approximately two (2) minutes prior to law enforcement's arrival. Upon arrival, ECSO SWAT team members made contact with a black 2015 GMC Yukon as it was attempting to exit the driveway to the residence. SWAT team members detained KEYS who was the driver of the vehicle. Also detained was the front-seat passenger TAMIKA RUTTLEN (RUTTLEN). A knock and announce was conducted at which time there was no answer at the door; therefore, forced entry was made into the residence. After the residence was secured, a search commenced. In the living room, investigators located multiple firearms to include a Glock 22 Gen 4 9mm with a magazine and a Machine Gun Conversion Device attached to the firearm, a Cobray M12 .380 ACP with a magazine and ammunition, and a SCCY 9mm CPX-2 with a magazine and ammunition. Also located were two rifles in the front room identified to be an Anderson AM-15 rifle with a magazine and ammunition, and an Anderson AR15 rifle with a magazine and ammunition. Multiple quantities of narcotics were collected from inside of the residence of Unit A from the living room, kitchen, and front room. The total weights for the narcotics seized are as follows: 851.5 grams of cocaine, 250.0 grams of fentanyl, 626.0 grams of marijuana, 178.0 grams of psilocybin mushrooms, and 0.5 grams of methamphetamine. All substances listed above were field tested by ECSO Investigators which tested positive. Below are sample images of relevant evidence seized:

16









26.    Also seized were the following cell phones which were found to be in KEYS' possession at the time of the search warrant: Silver Apple iPhone in clear case, Black Apple iPhone in black and blue case, and a Black Apple iPhone in black "Pelican" case.

27.    On June 3, 2025, the Honorable Judge Stephen Pitre signed state cell phone search warrants for the above listed phones found to be in KEYS' possession at the time of the search warrant. During a review of the devices, ECSO investigators observed photographs of narcotics and United States currency, as well as messages indicative of drug distribution on the devices. ECSO

investigators also observed the iCloud account **shannytown80@icloud.com** to be the registered Apple ID associated with the Silver iPhone and Black iPhone in black and blue case. Investigators also observed the email **keyssatori80@gmail.com** to be the registered Apple ID associated with the Black iPhone in black and blue case.

28.    Law enforcement learned that KEYS had recently obtained new cell phones. Your Affiant knows through training and experience that narcotics traffickers will switch out their cell phones often, and they also often maintain multiple phones and phone numbers to separate various aspects of their lives, such as narcotics trafficking, family, and legitimate business ventures. Your Affiant knows that KEYS' maintains multiple cellular telephones. In addition to what is described above, your affiant also observed multiple conversations within the Snapchat messages under the account name "mannys_33."

29.    On May 12, 2022, Snapchat account "wedgewood_cam" and KEYS using the account "mannys_33" discussed prices of marijuana. The conversation was as follows:

|  |  |
|---|---|
| wedgewood_cam: | "Woaaaa" |
| KEYS: | "What it do" |
| wedgewood_cam: | "What ya smokin like" |
| KEYS: | "Looking crazy right now" |

wedgewood_cam:          "Got sum Zot shit for ya"

KEYS:                   "Ticket pic"

30.     Based on your Affiant's training and experience, and the context of this conversation, your Affiant believes that the user of "wedgewood_cam" and KEYS were discussing the quantity and quality of marijuana that each other were in possession of. KEYS responds to "wedgewood_cam" by stating that is KEYS is in possession of a large quantity of marijuana by stating his quantity of marijuana is "looking crazy right now."

31.     Based on the evidence described above, as well as the information gathered from KEYS' seized cellular devices, your Affiant believes that KEYS is involved in the sale of controlled substances to include cocaine, fentanyl, and marijuana. Your Affiant also believes that other photographs, videos, and other digital documentation may be stored within KEYS' iCloud accounts, as KEYS recently obtained new cell phones, but appears to have maintained the same iCloud accounts.

## BACKGROUND CONCERNING APPLE SERVICES

32.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.  Apple provides a variety of

services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c. iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d. iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple

devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.  Find My Friends allows owners of Apple devices to share locations.

g. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

33.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

34.    An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

35.    Apple captures information associated with the creation and use of an Apple ID.  During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the

account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

36.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

37.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In

25

addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

38.    Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant

26

messages on iCloud Drive.  Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

39.    In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

40.    For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

41.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at

27

a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

42.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

43.    Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

44.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

45.    Based on the foregoing, I request that the Court issue the proposed search warrant.

46.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

47.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the

29

United States that has jurisdiction over the offense being investigated." 18 U.S.C. §
2711(3)(A)(i).

48.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement
officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

49.    Your Affiant further requests that the Court order that all papers in
support of this application, including the affidavit and search warrant, be sealed
until further order of the Court.  These documents discuss an ongoing criminal
investigation that is neither public nor known to all of the targets of the
investigation.  Accordingly, there is good cause to seal these documents because
their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Jarrett L. Swearingen
Special Agent
Drug Enforcement Administation

Subscribed and sworn to before me on this ___ day of August, 2025, in
Pensacola, Florida

HOPE THAI CANNON
United States Magistrate Judge